TRAVELERS FIRE INS. CO., APPELLEE, *v.* LOUIS G. FREEMAN CO. ET AL., APPELLANTS.
BUCKEYE UNION CASUALTY CO., APPELLEE, *v.* LOUIS G. FREEMAN CO., APPELLANT.

(Nos. 8278 and 8279—Decided July 1, 1957.)

*Mr. James E. Kimpel,* for appellee Travelers Fire Insurance Company.

*Messrs. Wise & Brose,* for appellant Louis G. Freeman Company.

*Mr. Louis E. Dietz,* for appellee Buckeye Union Casualty Company.

HILDEBRANT, P. J.   The plaintiffs, appellees, in these two appeals heard together on questions of law only, were subrogated to the rights of their respective assureds upon payment of the damages to a building and plate-glass window therein caused by the admittedly negligent operation of a 1952 Ford sedan automobile, belonging to the defendant company, by one Roger Boyd who, at the time of the accident, was an employee of the defendant company, being employed by it as a clerk.

The trial court without the intervention of a jury found for the plaintiffs, and the sole question in these appeals is whether there is substantial evidence in the record of the relation of agency or master and servant, within the scope of employment, imposing liability upon the defendant company under the doctrine of *respondeat superior.*   Whether the employee was agent or servant, there is no fundamental distinction as to the imposition of tort liability.

The reports and texts are filled with examples of automobile cases such as this, and recent authorities are not in harmony on the question involved, although most agree that it does not permit of categorical answer, but depends upon the facts and circumstances of each particular case.

A distinguishing feature of this particular situation is that the sole witness producing all the testimony on this point was a vice-president and treasurer of defendant company, called by plaintiffs as their witness, who testified with complete candor that serves to somewhat distinguish these cases.

Pertinent parts of the record are:

"Q. Now, directing your attention to the month of July of 1954, and particularly the date of July 13th, was your company the owner of a 1952 Ford sedan at that time? A. Yes.

"* * *

"Q. Now, on that date was there a Roger G. Boyd in your employ? A. There was.

"Q. What were his duties? A. I think he was a clerk in the office.

"* * *

"Q. Well now, how did he happen to be driving this automobile that belonged to your company? A. Well, the chap that ordinarily drove the car home at night was on vacation, and Boyd asked if he could drive the car. He said he had a driver's license and asked if he could use the car, so we let him.

"Q. Now, you say the chap who ordinarily drove the car home at night was on vacation; is that correct? A. That's right.

"Q. Was it your ordinary usage for some one of your employees to take that particular car home every evening? A. Ordinarily, yes.

"Q. What was the reason for that, Mr. Freeman? A. Well, we have quite a few company cars and rather than store them in garages, why, they take them home at night. One drives the car.

"Q. And he then stores the car for the night; is that correct? A. That's right; if he has storage room.

"Q. Now, do you have storage room at your company for all of your company automobiles? A. No, we don't.

"Q. How many automobiles does your company own? A. About 22, but not all of them here in Cincinnati.

"Q. Well, how many of them would be located in Cincinnati? A. Four or five.

"* * *

"Q. Now, when Mr. Boyd took his car home did you give him any instructions as to what to do with it? A. No. He just asked if he could take the car home and we told him yes.

"Q. Had he ever taken the car home before? A. I think he had taken it home the day before, Monday, if I recall. That was the first time, I believe, was Monday.

"* * *

"Q. Would this other young man who ordinarily took the car home—well, what were his duties as an employee of your company? A. I believe he was the delivery boy, worked in the shipping office, and used it for light delivery work mostly.

"The Court: Used it for what?

"The Witness: Light delivery.

"Q. Was this particular car ordinarly used for making deliveries? A. Yes, for light deliveries; that's right.

"Q. In and around the vicinity of Cincinnati? A. Cincinnati; that's right.

"Q. When Mr. Boyd took the car home did he make any deliveries in it that evening? A. No.

"Q. Was he to make any deliveries with it the following morning? A. No.

"Q. What time was Mr. Boyd due at work? A. Eight-fifteen.

"Q. That's the normal hour that your employees report in? A. That's when the office starts.

"Q. What facilities do you have at your company for the storage of these company cars? A. Well, when we leave them at the office they usually park them on the street overnight.

"Q. There is no inside parking facility for these cars? A. No.

"Q. There is no lot for these cars; is that right? A. There is no what?

"Q. There is no lot? A. No.

"*  *  *

"Q. Well, if Mr. Boyd had not taken the car home where would it have been parked over the night of July 12th and 13th, 1954? A. Probably on Hulbert Street, right next to the building.

"Q. Did you ask Mr. Boyd if he had facilities for storing the car overnight when he took it home? A. I don't recall but I doubt if I did.

"Q. Was there any payment or remuneration given to the company by Mr. Boyd for the use of that automobile? A. No.

"Q. Who put the gasoline in the car? A. The company."

On cross-examination, the witness testified:

"Q. Mr. Freeman, you made a statement on examination

before about permitting employees to take cars home at night because you would rather do that than put them in garages and pay for garage rent; is that correct? A. I didn't say that.

"Q. What did you say along those lines? A. I said if someone doesn't take it home they usually park it on Hulbert Street or in the neighborhood there.

"Q. I know you said that, but didn't you say prior to that, rather than garage the cars you let certain employees take them home? A. I don't believe I did. I don't recall saying that. " * * *

"Q. Was it your ordinary usage for some one of your employees to take that particular car home every evening? A. Ordinarily, yes.

"Q. What was the reason for that, Mr. Freeman? A. Well, we have quite a few company cars and rather than store them in garages, why, they take them home at night. One drives the car. " * * *

"Q. Now, did you talk with Mr. Boyd about this automobile before he took it home, sir? A. All I can recall is that he knew the regular driver of the car was on his vacation, and he asked me if he could drive the car home so he could use it. And I said yes."

In order to find liability on the part of the defendant company under the doctrine of *respondeat superior*, the trial court had to rely on the testimony as to the company practice of permitting employees to take company cars home at night in order to avoid the problem and expense, if any, of storage. The record shows that it was also a company practice to allow its cars to remain parked on a side street over night.

We are not required to decide a case involving an employee salesman regularly using a car, or one of the employees regularly taking a car home at night with the company approval in order to avoid a storage problem. It appears then from this record, so clearly that reasonable minds cannot differ, that Boyd asked whether he could drive the car and the primary reason was benefit to him, so that at that moment the legal relationship of bailment for the accommodation of Boyd was created. If any incidental benefit to the defendant company arose by reason of not having

to store the car overnight, and the witness did not concede it would be any advantage, it was no part of the consideration of Boyd's employment and was of no consequence in making him an agent or enlarging the scope of his employment to include custody of company cars.

In 5A American Jurisprudence, 635, Section 640, it is stated:

"The mere fact that an employer derives incidental benefits from the use of his car by an employee does not impose liability upon him for his employee's negligence. In such cases only the primary purpose for the use of the car should control. Incidental benefit which the employer may derive by reason of the fact that the car bore the employer's name and would, in a measure, advertise his business, or that the chauffeur may have incidentally been testing the car, or that the employee intended, during the excursion for himself, to procure accessories for use in the automobile, does not render the employer liable for the employee's negligence while so serving his own purposes, though where an employee uses his employer's truck partly for his own pleasure and partly for his employer's benefit by soliciting business, he may be held to have been acting within the scope of his employment." See annotation, 122 A. L. R., 858, 878, 889.

The burden of proof resting upon a plaintiff was set forth in *White Oak Coal Co.* v. *Rivoux, Admx.*, 88 Ohio St., 18, 102 N. E., 302, 46 L. R. A. (N. S.), 1091, Ann. Cas. 1914C, 1082. The first and third paragraphs of the syllabus are as follows:

"1. The owner of an automobile is not liable in an action for damages for injuries to or death of a third person caused by the negligence of an employee in the operation of the automobile, unless it is proven that the employee, at the time, was engaged upon his employer's business and acting within the scope of his employment.

"* * *

"3. A bookkeeper or cashier, employed in the office of the company, is not presumed from that fact alone, to have the implied authority to use or operate an automobile purchased and owned by the company for the use and purpose of a traveling salesman."

Almost directly in point and dispostive of these cases is

*Senn, Admx.,* v. *Lackner,* 157 Ohio St., 206, 105 N. E. (2d), 49, holding in the first, second and third paragraphs of the syllabus:

"1. Under the doctrine of *respondeat superior,* the test of a principal's liability is not whether a given act was performed during the existence of the agent's employment, but whether such act was done by the agent while engaged in the service of and while acting for the principal, in the prosecution of the latter's business. (Paragraph two of the syllabus in the case of *Lima Ry. Co.* v. *Little,* 67 Ohio St., 91, approved and followed.)

"2. Under this doctrine it is the burden of the plaintiff to adduce evidence tending to show that the agent was acting within the scope of his employment and that the right to control the agent's conduct was in the defendant principal.

"3. This test is not met by showing merely that a half hour before an employee was to begin his day's work he was driving from his home to his place of employment in a car owned by his employer and loaned to the employee by the employer for the sole benefit of the employee until he could carry out his intention to purchase a car of his own." See, also, *Rogers* v. *Allis-Chalmers Mfg. Co.,* 153 Ohio St., 513, 92 N. E. (2d), 677, 18 A. L. R. (2d), 1363.

Some of the witness' answers were:

"Well, the chap that ordinarily drove the car home at night was on vacation, and Boyd asked if he could drive the car. He said he had a driver's license and asked if he could use the car, so we let him." "All I can recall is that he knew the regular driver of the car was on his vacation, and he asked me if he could drive the car home so he could use it. And I said yes."

In the light of those answers, we conclude that the plaintiffs have failed to meet the burden of proof necessary to impose liability, under the doctrine of *respondeat superior,* on the defendant company. The judgments are reversed and final judgments rendered for the defendant company.

*Judgments reversed.*

Matthews, J., concurs.

LONG, J., dissenting. These cases are in this court on appeals from judgments rendered by the Cincinnati Municipal Court in favor of appellees and against the appellant Louis G. Freeman Company.

On July 13, 1954, at about 7:45 a. m., Roger Boyd, an employee of the Freeman company, was returning one of the company's cars to its place of business, and, as a result of the admitted negligence of Boyd, the automobile ran into a building at 12th Street and Central Avenue in Cincinnati, Ohio, causing certain damage.

. The appellee Travelers Fire Insurance Company paid to the owner of the building $627.30 for his damage, and the appellee Buckeye Union Casualty Company paid $194.96 on the plate-glass insurance, all because of the negligence of Boyd. The insurance companies, under their separate policies, then accepted subrogation of these claims and instituted the present actions against the Freeman company. By agreement the cases were tried together.

The sole question for determination by the court is whether, under the facts in these cases, there was sufficient evidence to warrant the court in finding that Boyd was the agent of the Freeman company, and that at the time of the accident he was acting within the scope of the authority conferred upon him by such company.

As to the following evidence there is no dispute.

Freeman company used four automobiles in the transaction of its Cincinnati business. It had established a custom of having its employees take its cars home with them rather than store them in garages. It had no storage room at the plant situated on Hulbert Street in the west end of Cincinnati, and the cars otherwise would be parked on the street overnight in an admittedly undesirable location in front of Freeman company's office. This is exactly the fact with reference to the car involved in the accident which was under the care of the employee, Boyd. Freeman company furnished the gasoline for all its cars, including the one being used by Boyd. This arrangement for the care of the automobiles, including the one involved in the accident, was, by express direction and custom, established by such company, all for its benefit. The company saved the expense of pro-

viding garage and storage space for its cars, that responsibility being given to each employee who took charge of a car for the night.

Let us look at the record. Louis Freeman, vice-president and treasurer of Freeman company, was called by the plaintiffs to establish agency. His testimony was as follows:

"Q. Was it your ordinary usage for some one of your employees to take that particular car home every evening? A. Ordinarily, yes.

"Q. What was the reason for that, Mr. Freeman? A. Well, wa have quite a few company cars and rather than store them in garages, why, they take them home at night. One drives the car.

"Q. And he then stores the car for the night; is that correct? A. That's right; if he has storage room.

"Q. Now, do you have storage room at your company for all of your company automobiles? A. No, we don't.

"* * *

"Q. Had he ever taken the car home before? A. I think he had taken it home the day before, Monday, I recall * * *.

"* * *

"Q. What facilities do you have at your company for the storage of these company cars? A. Well, when we leave them at the office they usually park them on the street overnight.

"Q. There is no inside parking facility for these cars? A. No.

"Q. There is no lot for these cars; is that right? A. There is no what?

"Q. There is no lot? A. No.

"Q. Well, if Mr. Boyd had not taken the car home where would it have been parked over the night of July 12th and 13th, 1954? A. Probably on Hulbert Street, right next to the building.

"* * *

"Q. Who put the gasoline in the car? A. The company."

Applying this evidence to the definition of an agent, what do we have, an agency or a bailment as determined by the majority?

As I understand the legal meaning of the word, agent, it is a person who is acting within the scope of his authority in the

business entrusted to him by his principal. Under this definition, let us examine the facts in this case.

Boyd was to take the car home, take care of it for the night by leaving it in his garage, on his driveway, on the public highway, or in a public garage, and then bring it back to his employer's place of business in the morning. Boyd was permitted the use of the automobile for his own purpose during the night after he had taken the car home. If the accident had happened while he was engaged in a frolic of his own, I would unhesitatingly agree with the majority. However, he had other instructions from his employer in addition to the permission to use the machine for his own purposes. The use of the car by the employee for his own purposes was incidental. The primary function of the employee was taking care of the car for the employer and bringing it back in the morning. We must look to these instructions to determine the extent of his authority. The employer had no garage within which to store the four automobiles which it used in its business; the cars would have to be stored in a public garage, left out for the night on the public highway in an admittedly undesirable neighborhood, or each car could be left in the custody of an employee, usually the employee who used the car in the daytime on the employer's business. It was a benefit to the employer to have the employee take charge of the car and safely keep it during the night. This practice, according to the undisputed evidence, was a well established custom of the employer. To execute this function, the employee had to take the machine home, and he had to bring it back in the morning. As previously stated, we are not concerned with what happened during the night. In the morning, pursuant to the express instructions, in carrying out the business entrusted to him by his employer, the employee was bringing the automobile in question back to the employer's plant to be used in its business, when the accident happened. Why is this not substantial evidence of the relation of master and servant? There is no dispute about this evidence. The trial court, which was the trier of the facts, could well have concluded that, at the time of the accident, the driver of the automobile was acting within the scope of his employer's business. The majority substitutes its judgment for that of the trier of the facts. The law is undis-

puted that, where there is substantial evidence to warrant the judgment, the appellate court has no choice except to sustian the judgment.

Suppose we view these cases upon the theory of the apparent authority of the agent.

In 2 Ohio Jurisprudence (2d), 99, Agency, Section 58, it is stated:

"In determining the apparent authority of an agent it is the conduct of the principal, rather than that of the agent, that is to be considered. The principal is only liable for that appearance of authority caused by himself. Apparent authority on the part of an agent cannot be established solely by the acts and conduct of the agent, but must be traced to some act or conduct of the principal."

Even on the theory of apparent authority, it is my judgment that these cases were properly decided by the Common Pleas Court.

Again, what are the facts in relation to this doctrine of apparent authority? Here is a company engaged in a substantial business, using four automobiles in the prosecution of that business. It not only permits but gives express authority to its employees to undertake custody and take care of its automobiles by taking them home and bringing them back to the plant in the morning. Is this not apparent authority under the established custom and conduct of the master?

As decided by this court in the case of *E. S. Gahagen Co.* v. *Smith*, 48 Ohio App., 290, 194 N. E., 26, "in an action for damages for personal injuries received when plaintiff was struck by an automobile owned by defendant automobile sales agency and driven by one of its employees, it is not error to refuse to direct a verdict for defendant when the evidence shows that the driver of the automobile was employed by defendant as a salesman on a commission basis, and was allowed to drive a car belonging to defendant to and from his home for lunch, and the injury occurred on return trip to the salesroom to secure a demonstrator car to immediately go to a customer."

That case is almost on all fours with the cases at bar. Here, Boyd, an employee, was permitted to take the automobile home with him, with special instructions to look after the car for the

night and bring it back in the morning. On the way back in the morning to put the car in service, he had the accident. Boyd was performing the duty enjoined upon him by the master.

Judge Ross, in his opinion in the *Gahagen case, supra,* said: "Where an employee under instructions from the master had taken fellow employees to their homes after work, liability was sustained against the employer for injuries negligently inflicted by the employee while on his way home with the vehicle after the performance of such duty." He cited, as authority for this pronouncement, *Silent Automatic Sales Corp.* v. *Stayton,* 45 F. (2d), 471.

In my opinion, there is substantial evidence in the cases at bar indicating that, at the time of the accident in question, the driver Boyd was acting upon instructions of his master and within the scope of his employment.

For the above reasons, it is my opinion that the judgments of the trial court should be affirmed.